UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLEN JONES, | No. 2:24-cv-02468-DAD-AC |
| Plaintiff, | |
| v. | ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAYING THIS ACTION FOR 30 DAYS |
| PENNEY OPCO, LLC, | |
| Defendant. | (Doc. No. 13) |

This matter is before the court on defendant's motion to compel arbitration. (Doc. No. 13.) On March 10, 2025, the pending motion was taken under submission on the papers. (Doc. No. 20.) For the reasons explained below, the court will deny defendant's motion to compel arbitration.

## BACKGROUND

Plaintiff alleges in her operative first amended complaint that defendant has engaged in a false discount advertising scheme by advertising perpetual discounts on its products while rarely, if ever, offering those products at their advertised listed price. (Doc. No. 10 at ¶¶ 2–3.) She further alleges that on May 12, 2022, she visited defendant's website and purchased a shirt at a purported discount, but in fact defendant had never sold that shirt at its listed price. (*Id.* at ¶¶ 72–80.) Based upon these allegations, plaintiff asserts three California state law claims against

1  defendant. (*Id.* at 1.) Defendant moves to compel arbitration of plaintiff's claims on the grounds
2  of two purported arbitration agreements: (1) the terms and conditions page of defendant's
3  website ("the Site Terms of Use");[1] and (2) the JCPenney Rewards Program Terms & Conditions
4  ("the RPTC") that went into effect in 2019 and to which, according to defendant, plaintiff has
5  agreed.[2]  (Doc. No. 13 at 5–7.)
6       Defendant filed its pending motion to compel arbitration on December 30, 2024. (Doc.
7  No. 13.) Plaintiff filed her opposition on February 28, 2025. (Doc. No. 18.) Defendant filed its
8  reply thereto on March 21, 2025. (Doc. No. 21.) On June 24, 2025 and July 1, 2025, plaintiff
9  filed notices of supplemental authority directing the court's attention to recent district court
10 decisions denying motions to compel arbitration on the basis of the Site Terms of Use and RPTC
11 where the plaintiff had asserted that defendant engaged in a similar false advertising and false
12 discount scheme. (Doc. Nos. 23, 27.) On July 18, 2025, defendant filed a response to plaintiff's
13 notices, arguing that the court should find those decisions to be distinguishable or unpersuasive.
14 (Doc. No. 31.)

## LEGAL STANDARD

16    A written provision in any contract evidencing a transaction involving commerce to settle
17 a dispute by arbitration is subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2. There is
18 generally a "liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 584
19 U.S. 497, 504 (2018). The FAA confers on the parties involved the right to obtain an order
20 directing that arbitration proceed in the manner provided for in a contract between them. 9
21 U.S.C. § 4. In considering a motion to compel arbitration, the "court's role under the [FAA] . . .

---

[1] Defendant mistakenly submitted evidence regarding the state of its website as it existed in 2024 rather than as it existed at the relevant times. (*See* Doc. No. 21 at 17.) Because the differences in the layout of defendant's website do not provide any basis upon which to grant the pending motion, the court does not discuss the parties' dispute over these immaterial facts. *See Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1200 (9th Cir. 2024) (noting that "motions to compel arbitration are subject to the summary judgment standard").

[2] The parties dispute whether plaintiff agreed to the 2019 version of the RPTC, a prior version, or neither. (*See* Doc. Nos. 13, 18, 21.) As discussed below, the court will assume without deciding that plaintiff agreed to the 2019 version of the RPTC as defendant contends and nevertheless deny the pending motion to compel arbitration.

2

is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996)). "When deciding a motion to compel arbitration, a district court must treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 922 (N.D. Cal. 2023) (internal quotation marks and citation omitted); *see also Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) ("The summary judgment standard is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.") (internal quotation marks and citation omitted).

## ANALYSIS

In its pending motion, defendant argues that plaintiff's claims must be compelled to arbitration on the basis of either of two arbitration agreements: (1) the Site Terms of Use, and/or (2) the Rewards Program Terms and Conditions. (Doc. No. 13 at 5–7.) The court will address whether defendant's motion will be granted on the basis of each purported agreement.

**A.     The Site Terms of Use**

"First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). "That principle follows from the fundamental premise that arbitration is strictly a matter of consent." *Id.* (internal quotation marks and citation omitted). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025).

3

The Ninth Circuit recently summarized the law regarding the formation of internet contracts:

> Online contracts are subject to the same elemental principles of contract formation as paper contracts. "To form a contract under California . . . law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." . . . A party may manifest assent through conduct. To do so, the party must intend the conduct and know, or have reason to know, the other party may infer her assent from the conduct.
>
> In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different "assent" mechanisms. In a browsewrap, the "user accepts a website's terms of use merely by browsing the site," although those terms are not always immediately apparent on the screen. *Courts consistently decline to enforce browsewraps.* In a clickwrap, the website presents its terms of use in a "pop-up screen" and the user accepts those terms by clicking or checking a box stating she agrees. Courts routinely enforce clickwraps. In a scrollwrap, which provides "the strongest notice" and are usually enforced, the user must scroll through all the terms before the website allows her to click a box to agree. Finally, a sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms.

*Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (internal citations omitted) (emphasis added).

Plaintiff contends, and defendant does not dispute, that the Site Terms of Use constitute a browsewrap. (*See* Doc. Nos. 18 at 20; 21 at 17); *cf. Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (describing "pure browsewrap" as "hidden in links located at the bottom of webpages"). "Courts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*

4

1.     Whether the Site Terms of Use Provide Reasonably Conspicuous Notice

Defendant argues that "California law does not categorically state that a contract can never be formed on the basis of browsewrap." (Doc. No. 21 at 17) (quoting *Weeks v. Interactive Llife Forms, LLC*, 100 Cal. App. 4th 1077, 1085 (2024)). Defendant contends that plaintiff was put on inquiry notice of the Site Terms of Use because of the hyperlink at the bottom of each page going to the Site Terms of Use. (*Id.*; Doc. No. 13 at 12–13.) In fact, the tiny gray hyperlink at the bottom of the relevant pages (*see* Doc. Nos. 18-3 at 1–6) is, as plaintiff describes it, "prototypical browsewrap" (Doc. No. 18 at 20) of the kind courts regularly find not to constitute an agreement.

Defendant further argues that plaintiff is a member of the Rewards Program who has shopped with defendant for over 20 years, and that this establishes an "ongoing relationship" with defendant that put plaintiff on inquiry notice of the Site Terms of Use. (Doc. No. 21 at 17) (citing *Oberstein*, 60 F.4th at 515–16). However, the Ninth Circuit's decision in *Oberstein* addressed a 'hybrid' form of agreement. *See Oberstein*, 60 F.4th at 515 ("Appellees' Terms are not pure clickwrap . . . . Nor are they pure browsewrap, as they are not hidden in links located at the bottom of webpages. Rather, they lie somewhere in between."). Moreover, defendant does not cite any authority suggesting that enrolling in a company's rewards program establishes a continuing relationship such that an individual is on inquiry notice of the separate terms of conditions for the use of the company's website. *Cf. Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 471 (2021) ("[T]he transactions at issue in the federal cases addressing sign-in wrap agreements mostly involve a consumer signing up for an ongoing account and, thus . . . contemplat[ing] entering into a continuing, forward-looking relationship."); *Sellers*, 73 Cal. App. 5th at 476 (noting that "the typical consumer would not expect to enter into an ongoing contractual relationship, regardless of whether the transaction occurs online or in person" where they are "buying a single pair of socks, or signing up for a free trial").

In any event, even if some form of continuing relationship was present here, defendant has not cited any authority finding that such a relationship would be sufficient to put the plaintiff on inquiry notice in the browsewrap context. Nor has the court located any such authority. To the

contrary, another district court recently concluded in virtually identical circumstances that the Site Terms of Use failed to provide reasonably conspicuous notice where the plaintiff was a member of the Rewards Program:

> Defendant argues that although Plaintiff never clicked a button or checked a box indicating that she agreed to the website's Terms and Conditions, "Plaintiff had inquiry notice of the Website Terms of Use based on her longstanding and ongoing relationship with JCPenney[.]" In support, Defendant argues that "browsewrap agreements are not categorically invalid under Oregon law[.]" The question, however, is not whether browsewrap agreements are categorically invalid, but whether the agreement at issue provided reasonably conspicuous notice and Plaintiff "unambiguously manifest[ed]" assent to those terms. . . .
>
> Neither the Terms and Conditions link nor the Legal link are conspicuous when viewed in the context of the entire webpage. The links are buried at the bottom of a page essentially overridden with an abundance of other links of the same size and color. Although some of the dozens of links are underlined—suggesting to the user that the link is a hyperlink—neither relevant link is underlined. Additionally, the user's eye is driven not to the bottom of the page, where these links are essentially lost amongst a plethora of other links, but to the top of the page. The top of the page, in contrast to the link-littered bottom, has four large, red circles advertising different services (like same–day pickup and the Rewards Program). The red circles are set off against the white background, drawing the user's eyes to that portion of the webpage. Ordinary website users expect that hyperlinks with "important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." In short, neither the Legal link nor the Terms & Conditions link provide "*reasonably* conspicuous notice of the terms to which the consumer will be bound." . . .
>
> Additionally, that Plaintiff used Defendant's website on multiple occasions does not mean that she had inquiry notice of the arbitration terms. "Together with the visual prominence of an advisal, we also consider under the first step the full context of the transaction, such as whether the type of transaction contemplates entering into a continuing, forward–looking relationship that would be governed by terms and conditions." [*Godun*, 135 F.4th at 710.] Although Plaintiff used the website to shop on multiple occasions, nothing in that relationship indicates a user would believe they entered a "continuous relationship" with Defendant merely by using the website. *Id.* (examples indicating a "continuing relationship" include creating an account requiring completion of a registration process, entering a free trial period, and downloading an application to their phone).

*Gamble v. Penney Opco LLC*, __ F. Supp. 3d __, 2025 WL 1806608, at *1 n.1, *3–4 (D. Or. July 1, 2025), *appeal filed* (9th Cir. July 15, 2025). The district court's analysis in *Gamble*

6

quoted above is entirely applicable to the pending motion, notwithstanding that Oregon state law was being considered in that case.³ The court also finds that analysis to be well-reasoned and persuasive.⁴

### 2.  Whether Plaintiff Unambiguously Manifested Her Assent

While the discussion above is a sufficient basis upon which to deny the pending motion to the extent it is predicated on the Site Terms of Use, the court additionally notes that defendant has provided no evidence that plaintiff "[took] some action, such as clicking a button or checking a box, that unambiguously manifest[ed] . . . her assent to those terms." *Berman*, 30 F.4th at 856. Indeed, defendant does not advance any argument as to the requirement of unambiguous manifestation of assent in its briefing. The court again finds the district court's analysis in *Gamble* to be persuasive in this regard:

> Finally, nothing in this record indicates that Plaintiff took any action—such as checking a box—indicating that she agreed to the arbitration terms. Instead, Plaintiff simply shopped on a website that had Terms and [Conditions] available via clicking on a link that was essentially buried under dozens of other similar looking links. The Court is unable to find, and Defendant fails to point to, any case in any jurisdiction where a court concluded a website user was on inquiry notice under facts remotely analogous to those present here. Because the relevant links were not "reasonably conspicuous," and because Plaintiff took no affirmative action indicating her

---

³ The district court in *Gamble* relied primarily on Ninth Circuit authority applying California law. *See, e.g.*, *Gamble*, 2025 WL 1806608, at *4 n.4 ("Although this case deals with Oregon law and *Godun* dealt with California law, the Ninth Circuit has 'consistently stated that no differences exist in the law of the different states as to internet contract formation.'"). Indeed, the circumstances are so similar to those presented here that defendant also filed a declaration from its vice president of marketing, William Cunningham, in *Gamble* with the same errors as the declaration filed by Cunningham in this action. *See id.* at *2 n.3 ("As outlined below, although Cunningham's declaration describes how the website appears today, the relevant portions of the website operated differently when Plaintiff made her purchase in August 2023. At that time, one had to click on the 'Legal' link, located next to the 'Terms and Conditions' link, to reach the website's Terms of Use."); (Doc. No. 13-2 at ¶ 6) (erroneously stating that the "Terms and Conditions" link at the bottom of defendant's website, rather than the "Legal" link, would have taken plaintiff to the Site Terms of Use at the time she made her purchase).

⁴ In its supplemental brief addressing the district courts' decisions in *Gamble* and *Close*, defendant argues that *Gamble* should not be found persuasive as to another issue regarding the RPTC, i.e., whether the evidence submitted by plaintiff is sufficient to establish that she is not sophisticated. (Doc. No. 31 at 3.) However, defendant advances no argument as to why the court should not adopt the analysis in *Gamble* as to the Site Terms of Use.

7

> unambiguous manifestation of her intent to be bound by the arbitration agreement found in Defendant's Terms and Conditions, she is not bound by that agreement.

*Gamble*, 2025 WL 1806608, at *5.

Accordingly, defendant's motion to compel arbitration, to the extent it is based on plaintiff's purported agreement to the arbitration provision contained in the Site Terms of Use, will be denied. *See Brooks v. IT Works Mktg., Inc.*, No. 1:21-cv-01341-DAD-BAK, 2022 WL 2079747, at *6–*7 (E.D. Cal. June 9, 2022) ("[T]he Terms of Use are only made available through a tiny grey hyperlink displayed against a slightly lighter grey background and located in the very bottom left corner of each webpage. The text of that hyperlink is so small that it is barely visible to the naked eye, and coupled with its muted grey color and background, it is considerably deemphasized in relation to the other text on the webpage. . . . Next, even assuming defendants had provided conspicuous notice (which they did not), they must also show that plaintiff unambiguously manifested her assent to be bound by the Terms of Use.") (internal citations omitted); *id.* at *7 n.6 ("When faced with pure browsewrap agreements, '[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement.'") (alterations in original).[5]

---

[5] While the Site Terms of Use contain a choice-of-law provision stating that the agreement is governed by Texas law (*see* Doc. No. 13 at 6), the parties exclusively brief the question of whether a valid arbitration agreement was formed on the basis of the Site Terms of Use under California law. (*See* Doc. Nos. 13 at 8, 11–13; 18 at 17–21; 21 at 17–18.) California and Texas law are similar in the relevant respects with Texas courts essentially relying on California law. *See StubHub, Inc. v. Ball*, 676 S.W.3d 193, 201 n.4 (Tex. Ct. App. 2023) (citing "the Second Circuit's treatment of browsewrap agreements in . . . *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002)"); *Specht*, 306 F.3d at 35 ("After reviewing the California common law . . . we conclude that . . . plaintiffs' downloading of SmartDownload did not constitute acceptance of defendants' license terms. Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.") (applying California law). Consequently, the court agrees that California law applies here. *See Brooks*, 2022 WL 2079747, at *4 n.2 ("[A] court will apply California substantive law unless the party timely invoking another state's law 'show[s] it materially differs from the law of California.'"). In any event, because California and Texas law are the same in the relevant respects, the choice of law is not material to the resolution of the pending motion.

8

**B.      The Rewards Program Terms and Conditions**

Defendant also moves to compel arbitration on the basis of the RPTC. (Doc. No. 13 at 5.) As recognized above, "[f]irst, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause." *Caremark*, 43 F.4th at 1030. The court will assume for the purposes of the pending motion that the parties formed a valid arbitration agreement on the basis of the 2019 RPTC. *See Gamble*, 2025 WL 1806608, at *1 n.2, *5 (assuming the existence of an agreement to arbitrate on the basis of the RPTC and proceeding to analyze the gateway issues of arbitrability); see also *Gill v. US Data Management, LLC*, 2:24-cv-05255-MCS-MAR, 2024 WL 5402494, at *2 (C.D. Cal. Dec. 2, 2024).

1.      Whether the Parties Agreed to Delegate Arbitrability to the Arbitrator

Next, the court must resolve whether the parties delegated the arbitrability of a particular issue to the arbitrator. *Caremark*, 43 F.4th at 1030. "While the general rule is that a district court decides whether a claim falls within the scope of an arbitration agreement, such questions 'can be expressly delegated to the arbitrator where the [contracting] parties *clearly and unmistakably* provide otherwise.'" *Patrick v. Running Warehouse, LLC*, 94 F.4th 468, 480 (9th Cir. 2024). "[I]ncorporation of the [American Arbitration Association ("AAA")] rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

Defendant notes that the AAA rules were expressly incorporated into the RPTC. (Doc. No. 13 at 13–14.) Plaintiff argues that she has provided evidence as to her lack of sophistication and that defendant has not provided any evidence or argument to the contrary in its pending motion. (Doc. No. 18 at 22 & n.8.) "District courts have split over whether *Brennan* impacts cases involving unsophisticated parties[.]" *Fischer v. Kelly Servs. Glob., LLC*, No. 23-cv-01197-JLS-JLB, 2024 WL 382181, at *9 (S.D. Cal. Jan. 31, 2024). The undersigned has consistently found the better view to be that incorporating the AAA rules into an agreement is not clear and unmistakable evidence of the intent to arbitrate arbitrability when one party is unsophisticated. *See Ruiz v. Kelly Serv. Glob. LLC*, No. 23-cv-02682-DAD-JDP, 2024 WL 3618222, at *5 (E.D. Cal. Aug. 1, 2024); *Fox v. Experian Info. Sols., Inc.*, 718 F. Supp. 3d 1231, 1238 (E.D. Cal.

2024); *Calzadillas v. Wonderful Co., LLC*, No. 1:19-cv-00172-DAD-JLT, 2019 WL 2339783, at *4–*5 (E.D. Cal. June 3, 2019).

Defendant argues in reply that the Ninth Circuit's decision in *Patrick*, where individual parties purchased goods from an online retailer, is applicable here. (Doc. No. 21 at 12) (citing *Patrick*, 94 F.4th 468). According to defendant, the Ninth Circuit in *Patrick* "rejected the plaintiffs' argument that incorporation of the JAMS rules by reference did not mandate delegation of arbitrability because they [were] unsophisticated parties, *in part* because plaintiffs offered no evidence concerning their sophistication or lack thereof to the district court." (*Id.*) (emphasis added). In fact, the lack of evidence regarding sophistication of one of the parties was the only basis for the court's holding in that decision. *See Patrick*, 94 F.4th at 481 ("Our circuit has not yet decided whether *Brennan*'s holding should extend to arbitration clauses in consumer contracts between a sophisticated entity and an average unsophisticated consumer. However, as Defendants observe, Plaintiffs offered no evidence concerning their sophistication or lack thereof to the district court. Accordingly, we need not decide the issue in order to resolve this case.").[6]

Here, plaintiff has provided a declaration stating that she is "an ordinary consumer" and "an unsophisticated layperson who is untrained in the law." (Doc. No. 1801 at ¶ 2.) Defendant does not directly contest plaintiff's lack of sophistication, but instead argues only that her declaration is insufficient. (Doc. No. 21 at 13.) Notably, defendant has "offered no evidence concerning [plaintiff's] sophistication or lack thereof[.]" *Patrick*, 94 F.4th at 481; *cf. Fli-Lo Falcon*, 97 F.4th at 1200 (noting that "motions to compel arbitration are subject to the summary judgment standard" and rejecting the plaintiffs' "unconscionability challenge to the Delegation Provision because their arguments are solely based on their supposed lack of sophistication and they have pointed to nothing in the record creating a dispute of material fact regarding their 'sophistication'"), 1201 ("Because we have rejected plaintiffs' only challenge to the Delegation Provision, and in doing so have found that plaintiffs are sophisticated, we must enforce the

---

[6] The Ninth Circuit still has yet to resolve this issue. *See Faucett v. Move, Inc.*, No. 24-2631, 2025 WL 1112935, at *1 n.1 (9th Cir. Apr. 15, 2025) ("We have 'not yet decided whether *Brennan*'s holding should extend to arbitration clauses in consumer contracts between a sophisticated entity and an average unsophisticated consumer.'").

10

Delegation Provision under *Brennan*."). Moreover, plaintiff's declaration here addresses factors such "whether the plaintiff is a consumer as opposed to a corporation" and "whether the plaintiff 'had legal training or experience dealing with complicated contracts.'" *Fli-Lo Falcon*, 97 F.4th at 1200; *cf. id.* ("[N]othing in plaintiffs' declarations suggest[s], for example, that they are first-time business owners or otherwise unfamiliar with commercial contracts[.]").

In light of plaintiff's declaration, and absent any evidence—or even argument—to the contrary submitted by defendant, the court finds no genuine dispute of fact as to plaintiff's lack of sophistication. The court therefore concludes that the *Brennan* rule is inapplicable here, that defendant has consequently failed to provide clear and unmistakable evidence of the parties' intention to delegate arbitrability to the arbitrator, and that the court must therefore analyze whether plaintiff's claims are covered by the RPTC's arbitration provision. *See Gamble*, 2025 WL 1806608, at *5–6 & n.6 (finding no clear and unmistakable evidence where the plaintiff provided a declaration similar to the one presented by plaintiff here and rejecting the defendant's same argument that the Ninth Circuit's decision in *Patrick* was applicable because the plaintiffs in *Patrick* had provided no evidence concerning their sophistication).[7]

/////

/////

---

[7] Despite initially citing Ninth Circuit authority, defendant argues in its pending motion that Texas law applies to the question of whether the parties intended to arbitrate arbitrability. (Doc. No. 13 at 13–14.) In its reply, defendant relies exclusively on federal law. (*See* Doc. No. 21 at 11–14.) As plaintiff correctly notes (Doc. No. 18 at 25), "federal law governs the arbitrability question by default because the Agreement is covered by the FAA, and the parties have not clearly and unmistakably designated that nonfederal *arbitrability* law applies." *Brennan*, 796 F.3d at 1129. The RPTC states that "these terms will be governed by and construed under the substantive laws of the State of Texas, without reference to conflict-of-laws considerations," but also provides that "the Federal Arbitration Act and federal arbitration law apply to this agreement to arbitrate." (Doc. No. 13-2 at 24.) Under the Ninth Circuit's decision in *Brennan*, federal law therefore applies in resolving this question. *See, e.g.*, *Hong Kong Cont'l Trade Co. Ltd. v. Natural Balance Pet Foods, Inc.*, No. 22-cv-00571-JAK-AFM, 2023 WL 2664246, at *7 (C.D. Cal. Mar. 28, 2023). In any event, Texas law appears to be similarly unsettled regarding the sophistication issue. *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 704–08 (discussing the consensus among courts in other jurisdictions, noting that court have "often disagreed" when "the agreement involves an unsophisticated party," and "agree[ing] with the vast majority of courts that, as a general rule," incorporation of AAA rules constitutes clear and unmistakable evidence).

### 2. Whether the RPTC Covers Plaintiff's Claims

"Federal law governs the scope of an arbitration agreement." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1058–59 (9th Cir. 2020). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Id.* (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

The 2019 version of the RPTC states that "[a]ny dispute or claim arising out of or relating in any way to a Member's participation in the Program, including, without limitation, the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits, will be resolved by binding arbitration[.]" (Doc. No. 13-2 at 24.)

Defendant argues that the RPTC "plainly cover[s] plaintiff's suit." (Doc. No. 13 at 14.) In support of this argument, defendant recites only the text of the RPTC and notes the strong presumption in favor of arbitration under Texas law, particularly when the arbitration clause is "broad" as it contends is the case here. (*Id.*)

Plaintiff argues in opposition that her false advertising claims, which arise out of her purchase of allegedly falsely discounted clothing from defendant's website, do not relate in any way to her participation in the Rewards Program. (Doc. No. 18 at 26.) Plaintiff further argues that the Tenth Circuit rejected defendant's precise arguments in its decision in *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051 (10th Cir. 2018). (*Id.*) Any differences between the 2014 version of the RPTC considered by the Tenth Circuit and the 2019 version of the RPTC at issue in this case are, according to plaintiff, "immaterial." (*Id.* at 27, 28.) In fact, plaintiff contends that it is actually even clearer that the 2019 RPTC does not cover her claims presented in this action because it includes examples of covered disputes that were not included in the 2014 version—namely, "the Issuance of Points, the Issuance or redemption of Rewards, or the receipt of any Program benefits"—and those examples are clearly distinct from plaintiff's claims asserted in this case. (*Id.* at 27.) Finally, plaintiff argues that "it is telling that JCPenney can list numerous reasons for why Ms. Jones's claims are covered under the Terms of Use; yet, JCPenney is silent when it comes to how Ms. Jones's claims are related to the Rewards Program. This, of course, is

12

1  because Ms. Jones's claims are only covered under the Terms of Use (which she did not agree
2  to)." (*Id.* at 28.)

3  In reply, defendant contends that plaintiff's claims relate "in *some* way" to the Rewards
4  Program because they "arise[ ] from an online purchase that Plaintiff made as a Rewards member,
5  for which she earned Rewards points." (Doc. No. 21 at 14.)  Defendant further argues that the
6  Tenth Circuit's decision in *Cavlovic* is inapposite because the court was considering the 2014
7  version of the RPTC. (*Id.* at 15–16.) "More importantly," defendant argues, the Tenth Circuit's
8  decision in *Cavlovic* ignored Texas law construing the phrase "arising from and related to"
9  broadly. (*Id.* at 16.) However, defendant does not cite any Texas state court authority from
10 supporting this contention.

11 After defendant had filed its reply, plaintiff filed notices of supplemental authority
12 directing the court's attention to the two recent district court decisions addressing similar
13 circumstances, namely *Gamble* and *Close v. Penney Opco LLC*, __ F. Supp. 3d __, 2025 WL
14 1721002 (W.D. Wash. June 20, 2025), *appeal filed* (9th Cir. July 7, 2025). (Doc. Nos. 23, 27.)
15 Plaintiff noted that both of the district courts in *Gamble* and *Close* concluded that false
16 advertising claims regarding allegedly fraudulent discounts did not "arise from or relate to" the
17 Rewards Program. (*Id.*) In its response to those notices, defendant argues that both courts erred
18 in relying on the Tenth Circuit's decision in *Cavlovic* and that the court should conduct "an
19 independent analysis of Texas law." (Doc. No. 31 at 4.) Again, defendant cites no Texas caselaw
20 supporting the argument presented in its response.

21 Defendant's arguments are not persuasive. Importantly, while defendant contends that the
22 several federal courts addressing similar or identical language failed to properly consider Texas
23 law, defendant has not argued for—nor has the court identified—any material differences
24 between Texas and federal law on this issue. Defendant argues that Texas courts apply a "strong
25 presumption favoring agreements to arbitrate," that this presumption is "so compelling that a
26 court should not deny arbitration 'unless it can be said with positive assurance that an arbitration
27 clause is *not* susceptible of an interpretation which would cover the dispute at issue,'" and that
28 this is "particularly" true "when the clause is broad" and "provides for arbitration of . . . 'any

controversy or claim arising out of or relating to the contract thereof[.]'" (Doc. No. 13 at 14) (quoting *Cedillo v. Immobiliere Jeuness Establishment*, 476 S.W.3d 557, 567 (Tex. Ct. App. 2015)).  However, Texas courts have taken all of these principles from federal law.  (*See id.*) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (considering the FAA); *Prudential Secs. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (considering the FAA and citing decisions from the Fifth Circuit); *Baty v. Bowen, Miclette & Britt, Inc.*, 423 S.W.3d 427, 440 (Tex. Ct. App. 2013) (citing a Texas Court of Appeals decision that in turns cites Fifth Circuit decisions considering the FAA)); *cf. Cedillo*, 476 S.W.3d at 563 n.3 ("The FAA and [Texas General Arbitration Act ("TGAA")] address the same underlying substantive principles. Because the substantive principles applicable to our analysis are the same under either act, we cite cases decided under the FAA and TGAA interchangeably.").  Indeed, as the Tenth Circuit has noted, all of these rules of law stem from Supreme Court decisions.  *See Brent Elec. Co. v. IBEW Local Union No. 584*, 110 F.4th 1196, 1211–12 (10th Cir. 2025).

Moreover, defendant's argument that "*Cavlovic* does not cite Texas case law discussing the broad interpretation of 'arising under or related to'" (Doc. No. 21 at 16 n.6) is simply incorrect.  *See Cavlovic*, 844 F.3d at 1059 ("And under Texas law, our inquiry continues beyond an initial determination that the arbitration provision is broad.  *See BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 718 (Tex. App. 2015) (holding that '[w]hether a claim is subject to arbitration turns on its substance').") (alterations in original); *BBVA Compass*, 456 S.W.3d at 722 (discussing "broad" arbitration provisions including "arising from or relating to" language). Indeed, the Tenth Circuit expressly cited authority addressing all of the rules of Texas law discussed above.  *See Cavlovic*, 844 F.3d at 1059 (citing *BBVA Compass*, 456 S.W.3d at 718). As noted, defendant simply does not explain in any meaningful detail how the application of these rules by the Tenth Circuit in *Cavlovic* was incorrect.

Defendant also argues that the court's decision in *Cavlovic* is inapposite because the 2014 version of the RPTC considered by the Tenth Circuit did not include the specific phrase "in any way." (Doc. No. 21 at 15); *see also Cavlovic*, 884 F.3d at 1059 ("The 2014 Rewards Program agreement covers all claims 'arising from or relating to' the Rewards Program.").  However,

14

defendant fails to cite any authority suggesting that such language alters the analysis significantly, or at all, under Texas law. To the contrary, the Texas Court of Appeals has suggested otherwise:

> Cash America still contends that the premises liability claim falls within the scope of the agreement, emphasizing in particular the final clause which states that the parties agreed to arbitrate any dispute "*in any way* arising out of or between the relationship between the parties whether now existing or hereafter arising, and whether sounding in contract, tort, equity, or otherwise." Cash America believes that, through this language, the parties agreed to arbitrate any future dispute, so long as the dispute arose between the parties' "relationship," even if that relationship exists as between an invitee and a premises owner. But to accept this argument, we would have to conclude that the parties intended to arbitrate every possible dispute between them into perpetuity—no matter the dispute's connection to the underlying pawn transaction. There is nothing to support a holding that the parties intended for such a limitless scope.

*Cash Am. Pawn LP v. Meza*, 653 S.W.3d 340, 343 (Tex. Ct. App. 2022) (emphasis added).

The court finds the Tenth Circuit's decision in *Cavlovic* and the district court's decision in *Close* to be persuasive. *See Cavlovic*, 884 F.3d at 1060 ("[A]s a Texas appellate court determined in declining to compel arbitration, it is difficult to 'see that this is a claim "arising out of or relating to" the contract' because even if the parties 'honored their contractual obligations in every respect' under the Rewards Program agreement, the contractual compliance would not affect Cavlovic's allegations.") (quoting *Fridl v. Cook*, 908 S.W.2d 507, 513 (Tex. Ct. App. 1995)); *Close*, 2025 WL 1721002, at *4 ("[T]he allegedly false advertised discounts not do not 'arise from' or 'relate' to her membership in the rewards program or the number of points she received for her purchases."). The court also finds persuasive the decision in *Gamble*, in which the district court addressed the identical provision as that at issue here as follows:

> Here, Plaintiff's claims do not arise out of, or relate in any way, to her membership in Defendant's Rewards Program. And by including specific examples of disputes that may be subject to the arbitration clause—i.e., "the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits"—the arbitration agreement here appears narrower than that analyzed in *Cavlovic*. Finally, Defendant certainly knew how to draft a broad arbitration agreement. . . . In stark contrast, the Rewards Program contained much narrower language [than the arbitration provision in the Site Terms of Use.]

*Gamble*, 2025 WL 1806608, at *7.

15

"Plaintiff's claims do not fall within the scope of the [RPTC], as multiple courts have now concluded. Thus, JCPenney's motion to compel arbitration pursuant to those terms fails." *Close*, 2025 WL 1721002, at *4. Accordingly, defendant's motion to compel arbitration will be denied in its entirety.

**C.     Whether to Stay this Action**

Defendant argues that even if its pending motion is denied, the court must stay this action pursuant to the Supreme Court's decision in *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 738 (2023). (Doc. No. 13 at 16 n.2.) Plaintiff counters, arguing that the court "should not stay proceedings unless and until JCPenney files a notice of appeal." (Doc. No. 19 at 29 n.12.)

"[A] district court is 'require[d]' to enter an 'automatic stay' pending appeal when a party exercises its statutory right under 9 U.S.C. § 16(a) . . . to an interlocutory appeal of the denial of a motion to compel arbitration." *California ex rel. Harrison v. Express Scripts, Inc.*, 139 F.4th 763, 767 (9th Cir. 2025) (second alteration in original). Defendant does not address in its reply whether an automatic stay is required prior to defendant exercising its right to appeal. *Cf. Coinbase*, 599 U.S. at 747 ("We conclude that, *after* Coinbase appealed from the denial of its motion to compel arbitration, the District Court was required to stay its proceedings.") (emphasis added). In any event, the court finds that a temporary stay of this case, specifically until 30 days after the date of entry of this order, is appropriate pursuant to the court's inherent authority and in light of the Supreme Court's decision in *Coinbase*. *See* Fed. R. App. P. 4(a)(1)(A) ("In a civil case . . . the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from."); *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

/////
/////
/////
/////

**CONCLUSION**

For the reasons discussed above,

1. Defendant's motion to compel arbitration (Doc. No. 13) is DENIED;

2. This action is STAYED until 30 days after the date of entry of this order pursuant to the Supreme Court's decision in *Landis*;

3. If defendant files a timely notice of appeal of this order, this action will be automatically STAYED pending further order of this court pursuant to the Supreme Court's decision in *Coinbase*.

IT IS SO ORDERED.

Dated: **August 1, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

17